**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAULA TYRE WILLIAMS, | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BALA RETIREMENT AND | : | |
| NURSING CENTER, | : | |
| Defendant. | : | NO. 06-1005 |

**MEMORANDUM AND ORDER**

GENE E.K. PRATTER, J.                                                           AUGUST 31, 2007

Plaintiff Paula Tyre Williams has filed a Complaint against the Bala Nursing and

Retirement Center ("Bala") alleging racial discrimination in violation of 42 U.S.C. § 1981 (§

1981), 42 U.S.C. § 2000e ("Title VII"), and the Philadelphia Fair Practices Ordinance, §9-1103

(A)(1), as well as age discrimination in violation of the Age Discrimination in Employment Act,

29 U.S.C. §§ 623-624.  Ms. Williams avers that the termination of her employment in January

2005 arose from racial and age discrimination by Bala.

Presently before the Court is Bala's Motion for Summary Judgment and its Partial Motion

for Summary Judgment[1] of Plaintiff's request for punitive damages.  Ms. Williams has indicated

in her Response to the initial Motion that she no longer wishes to pursue her claim of age

discrimination.  The remaining claims of racial discrimination fail for the reasons set forth below.

---

[1]The Court notes that the Partial Motion for Summary Judgment (Docket No. 14) was
untimely filed well after the deadline for dispositive motions set by the Court's Scheduling
Order.  (Docket No. 6.)  Inasmuch as the Court will grant Bala's initial, timely motion for
summary judgment, the lateness of the Partial Motion, as well as that Motion itself, is moot.

1

I.      **FACTUAL BACKGROUND**

Bala is a 24-hour-a-day nursing and rehabilitation center that employs approximately 150 nurses.  (Dep. of Bernadette Salopek, Def.'s Mot., Ex. E at 10:20-23.)  Bala's mission is to enhance the physical, psychological, and emotional functioning of its residents.

Plaintiff Paula Tyre Williams worked as a Charge Nurse at Bala from January 2001, until she voluntarily resigned on September 9, 2002.  (Def.'s Statement of Facts ("SOF") ¶¶ 1-2.) Approximately one year after her resignation, Ms. Williams re-applied to Bala and was re-hired to work as its Restorative Nursing Coordinator ("RNC").  Id. at ¶ 3.[2]

The RNC was responsible for overseeing Bala's Restorative Nursing Aides ("Aides"), who administer "a form of physical therapy" to Bala's residents.  Id.  at ¶ 4.  Each week, the Aides would see multiple patients and write a weekly summary of the visit in each patient's chart.  (Salopek Dep. 12:19-24.)  The RNC was expected to review the Aides' weekly summaries of patient care to verify that the Aides had seen each patient, each week.  Id. at ¶ 14.[3]  The RNC

---

[2]Restorative Nursing is described as the link between therapy and nursing.  Restorative Nurses work with patients to maintain progress towards healing.

[3]In relevant part, Bala's RNC Job Description provides a follows:
RESPONSIBILITIES
Attends mandatory programs to meet state, federal and Bala Nursing and Retirement Center's requirements and assigns staff to attend.
Coordinates restorative nursing referrals.
Assembles RNA documentation and prepares monthly summaries
Supervises RNP dining program
Chairs Fall committee, manages the Falling Star Program, and Fall Risk care plans.
Investigates and completes Unusual Event forms related to falls.
Supervises bowel and bladder assessments, care plans, and documentation.

(Def.'s Mot. For Summ. J., Ex. C.)

also completed the Aides' patient paperwork by making a brief note in each patient's chart

indicating that the RNC had reviewed the Aides' notes and approved their accuracy.  Id. at ¶ 15.

If a particular resident had not been seen, the RNC was to investigate and determine the

appropriateness of the Aide's decision not to see the resident.  Id.  Unlike the Aides, the RNC

had no direct patient interaction, but occupied a supervisory role.  As such, the RNC reported

directly to Bala's Director of Nursing, Bernadette Salopek.

In January 2005, Bala made the "business decision" to eliminate the RNC position.  (Dep.

of Marva Glazer, Def.'s Mot., Ex. D at 30:14.)  Bala immediately offered Ms. Williams a

position as a full-time Charge Nurse, which she accepted.  (Def.'s SOF ¶ 6.)  Bala did not hire

anyone to replace Ms. Williams in the RNC position, and Ms. Williams did not perceive that her

reassignment to the Charge Nurse position was the result of any kind of discrimination.  Id. at ¶¶

7, 8.

According to Bala, the Charge Nurse position was a "totally different job" from the RNC

position.  (Salopek Dep. 32:22.)  Charge Nurses directly monitored and cared for over 30

different patients.  (Def.'s SOF ¶ 23.)  In terms of the "paperwork" component of the job, Bala

required Charge Nurses to complete "monthly summaries," and "weekly progress notes,"

regarding the patients, as well as to make a note if "something out of the ordinary occur[ed]," or

if a patient fell.  Id. at ¶ 22.  Charge Nurses also updated "care plans," documented each patient's

medication, and received and executed "verbal orders from doctors."  Id.

Shortly before Ms. Williams was to begin her job as a Charge Nurse, Bala discovered that

Ms. Williams had not completed several months of paperwork that she was required to complete

as the RNC.  Id. at ¶ 9.  On January 13, 2005, Ms. Salopek terminated Ms. Williams before she

began to work as a Charge Nurse.  Id. at ¶¶ 9, 10.  Ms. Williams testified that Bala informed her

that her termination was due to her failure to complete "at least two months" of paperwork.  Id. at

¶¶ 13, 16.[4]  Although Bala could not say for sure that Ms. Williams's incomplete paperwork

caused injury to any particular patient, Bala contends that gaps in this type of documentation

could have caused, and still may cause, economic and regulatory impacts upon Bala as an

organization.  (Glazer Dep. 17:19-18:24.)  While  Ms. Williams admitted that she did not

complete her required paperwork, (Def.'s SOF ¶ 18), she believes that race was the true

motivation behind Bala's decision.

In her four years of work at Bala, Ms. Williams admitted that she had never been

subjected to discriminatory or offensive comments based on her race.  Id. at ¶ 11.  However, Ms.

Williams avers that she was terminated because she is African-American, and not due to her

performance at Bala, because two of Bala's Caucasian employees, namely Laurie Bass and

Laurie Cashatte, were retained as employees despite their similar situation to Ms. Williams.[5]

Laurie Bass was a Charge Nurse at Bala while Ms. Salopek was Bala's Director of

Nursing and while Ms. Williams was the RNC.  Ms. Bass was required to complete daily

paperwork as part of her job, and at times Ms. Bass requested to work extra hours in order to

complete her paperwork.  Bala permitted Ms. Bass to work these extra hours to finish her

paperwork, and on at least some of these occasions, Bala paid Ms. Bass overtime compensation

---

[4]Ms. Salopek filled out an Employee Termination form for Ms. Williams in which she indicates that five months of paperwork were incomplete.  (Pl.'s Resp. to Def.'s SOF ¶ 16.)

[5]Ms, Williams initially named another Bala employee, Lauren Weigand, as a comparator. However, during oral argument counsel indicated that Ms. Williams no longer viewed Ms. Weigand as a similarly situated comparator.  (Tr. 2/6/07 14:24-15:6.)

for her extra hours.  (Bass Dep. 10-11, 14-15.)  Ms. Bass was never disciplined for failing to

complete paperwork or for staying late to complete the paperwork, and Ms. Salopek testified that

she never became aware of any instance where Ms. Bass failed to complete her required

paperwork.  (Def.'s SOF ¶¶ 27-28.)

Laurie Cashatte also worked as a nurse at Bala.  At some point in or around 2002 Ms.

Williams served as Ms. Cashatte's unit manager.  (Williams Dep. 49:19-24.)  Ms. Williams

testified that during the time when she supervised Ms. Cashatte, she reviewed Ms. Cashatte's

patient charts and discovered that Ms. Cashatte had falsified a particular patient's medical

records.  (Williams Dep. 48:24-50:5.)  She also testified that she discovered that Ms. Cashatte

forged another nurse's signature on a patient chart.  (Williams Dep. 58:9-25.)  Ms. Williams

claims that despite this misconduct, Bala investigated but took no disciplinary action against Ms.

Cashatte until after the Commonwealth of Pennsylvania intervened in the matter, and forced Bala

to take action.  Bala ultimately terminated Ms. Cashatte for her disciplinary infractions.[6]  (Def.'s

SOF ¶ 37.)

After Bala terminated Ms. Williams's employment in January 2005, she worked for

various staffing agencies until October 17, 2005, when she began full-time work as a Charge

Nurse at another retirement facility.  (Williams Dep. 91:13-24.)  Ms. Williams filed an

administrative charge of discrimination with the Equal Employment Opportunity Commission,

and, thereafter, upon receiving a Notice of Right to Sue, Ms. Williams commenced this action on

---

[6]Ms. Glazer testified that Ms. Cashatte was terminated due to poor performance and due
to "drugs that were missing or inappropriately ordered." (Glazer Dep., Def.'s Mot., Ex. D at
21:6-21:24.)

March 5, 2006.[7]

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a

reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of

the case under governing law. Id. _____

_____A party seeking summary judgment always bears the initial responsibility for informing

the district court of the basis for its motion and identifying those portions of the record that it

believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular

issue at trial, the moving party's initial burden can be met simply by "pointing out to the district

court that there is an absence of evidence to support the non-moving party's case." Id. at 325.

After the moving party has met its initial burden, "the adverse party's response, by affidavits or

as otherwise provided in this rule, must set forth specific facts showing that there is a genuine

issue for trial." Fed. R. Civ. P. 56(e). Summary judgment is appropriate if the non-moving party

fails to rebut by making a factual showing "sufficient to establish the existence of an element

_____

[7]There is no evidence of record pertaining to the EEOC charge or the Notice of Right to
Sue. However, because Bala does not challenge the timeliness of the charge, or this action, the
Court will assume that Ms. Williams complied with the relevant limitations periods and
regulatory prerequisites.

essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the

motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

## III.   DISCUSSION

### A.   BURDEN SHIFTING FRAMEWORK

Ms. Williams has not produced evidence of direct discrimination in any form, (Williams

Dep. 32:25-33:6), and thus her claim is one of pretext.  The burden to prove discrimination via a

pretext claim is governed by the framework announced in McDonnell Douglas Corp. v. Green,

411 U.S. 792 (1973).  See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).  Under

this framework, a plaintiff must first establish a prima facie case of discrimination.  Id.  If the

plaintiff succeeds, the burden shifts to the defendant to "articulate some legitimate,

nondiscriminatory reason" for its actions.  Id. at 920 n. 2.  Should the defendant carry this

burden, the plaintiff must convince the factfinder "both that the reason was false, and that

discrimination was the real reason" for its adverse employment decision.  Id. (quoting St. Mary's

Honor Center v. Hicks, 509 U.S. 502, 509 (1993)).

### B.   PRIMA FACIE RACIAL DISCRIMINATION

The existence of a prima facie case of employment discrimination is a question of law to

be decided by the Court.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).[8]  To

establish a prima facie case for race discrimination, a plaintiff must prove:  (1) that she is a

member of a protected class; (2) that she suffered some form of adverse employment action; (3)

---

[8]Plaintiff's claims arising under § 1981 and the Philadelphia Fair Practices Ordinance are
analyzed under the same legal framework as her claims arising under Title VII.  Joseph v.
Continental Airlines, 126 F. Supp. 2d 373, 376 (E.D. Pa. 2000).

under circumstances that give rise to an inference of unlawful discrimination, such as might

occur when a similarly situated person not of the protected class is treated more favorably.  Lin v.

Rohm & Haas Co., 293 F. Supp. 2d 505, 517-18 (E.D. Pa. 2003) (citing Jones v. School Dist. of

Phila., 198 F.3d 403, 410 (3d Cir. 1999)).

It is not disputed that Ms. Williams is a member of a protected class, nor is it disputed

that she has suffered the adverse employment action of discharge.  However, Bala argues that

Ms. Williams's comparator evidence is insufficient to establish a prima facie case of race

discrimination.

Comparator evidence may suffice to raise an inference of discrimination.  However, a

plaintiff must prove that she is "similarly situated" to her comparators and that they have been

treated differently by their employer.  Andy v. UPS, 2003 U.S. Dist. LEXIS 25193, at *33 (E.D.

Pa. Oct. 28, 2003) (citing Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998)).

"Similarly situated" means "similar 'in all relevant respects.'"  Id.  (quoting Singh v. Wal-Mart

Stores, Inc., 1999 U.S. Dist. LEXIS 8531, at *19 (E.D. Pa. June 10, 1999)).  This includes

similarity between the requirements, duties and responsibilities of the respective jobs, but also

similarity of the conduct (or misconduct) in which each employee engaged.  Dill v. Runyon,

1997 U.S. Dist. LEXIS 4355, at *12 (E.D. Pa. 1997) ("To be deemed 'similarly situated,' the

individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct

without such differentiating or mitigating circumstances that would distinguish their conduct or

the employer's treatment of them for it.'") (quoting Anderson v. Haverford College, 868 F. Supp.

741, 745 (E.D. Pa. 1994)).

There is no evidence of record tending to show that Ms. Cashatte is an adequate

comparator to Ms. Williams.  Ms. Cashatte engaged in misconduct of an entirely different nature

than Ms. Williams by allegedly forging and falsifying patient records, and furthermore, like Ms.

Williams, Bala terminated Ms. Cashatte for workplace infractions.  However, the evidence of

record pertaining to Ms. Bass is sufficient to raise an inference that Ms. Williams was terminated

for a discriminatory reason.

The Court recognizes that there are several significant differences between Ms. Bass and

Ms. Williams.  As the RNC, Ms. Williams had no responsibility for direct patient care, whereas

as a Charge Nurse, Ms. Bass's primary responsibility is patient care.  (Salopek Dep. 33:4-11.)

Charge Nurses are responsible for evaluating medication needs, providing and signing-out

medication, monitoring the condition of the patients, writing patient incident reports, and making

sure patients received regular meals.  (Salopek Dep., 32:22-33:8; Bass Dep., 8:1-4.)  Conversely,

many of Ms. Williams's duties were supervisory or organizational.  Ms. Williams was

responsible for coordinating and managing various patient programs at Bala, such as the "Falling

Star Program," and the "Fall Risk" care plans.  (Def.'s Mot., Ex. C.)  She was also the Chair of

the "Fall Committee."  Id.  Further, Ms. Williams's job required her to attend "programs" to meet

both internal and regulatory compliance requirements, as well as to assign staff to attend these

programs, to coordinate restorative nursing referrals and the dining program, and to supervise

and complete various documentation.  Id.

Notwithstanding the differences between Ms. Williams's and Ms. Bass's positions, Ms.

Williams has produced evidence that both the RNC and the Charge Nurses shared a common,

relevant and fundamental responsibility to complete patient documentation and other paperwork.

To be similarly situated does not mean to be identically situated in all aspects.  Red v. Potter, 211

F. App'x 82, 84, (3d Cir. 2006) (finding that comparators must be similarly situatied in all of the *relevant* aspects) (citations omitted).  Such a standard would be impractical, particularly in cases, such as the present one, where a plaintiff occupies a unique position within an organization.  Ms. Williams was the only RNC employed at Bala.  In such cases, a standard requiring identity would eviscerate a plaintiff's ability to employ comparator evidence to make a case of prima facie discrimination, and instead require the plaintiff to produce direct evidence of discrimination. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352-53 (6th Cir. 1998).  The law makes no such demand.

There is also evidence that both Ms. Williams and Ms. Bass had trouble completing their required paperwork within regular business hours.  Ms. Bass requested and was granted additional time to complete her paperwork.  (Bass Dep. 10-11; 14-15.)  However, Ms. Williams testified that although she requested additional time to complete her paperwork, Bala refused to allow her extra time to complete her work.  (Williams Dep. 82-86.)  Bala disputes that Ms. Williams requested to work extra hours.  However, the evidence is sufficient to establish that there is a genuine issue of material fact as to whether Bala declined to provide Ms. Williams the same opportunity as the organization had provided to Ms. Bass, thus facilitating a situation that ultimately led to her termination.

### C.      BALA'S LEGITIMATE NONDISCRIMINATORY REASON FOR MS. WILLIAMS'S DISCHARGE

Having found that Ms. Williams has established a prima facie case, the burden shifts to Bala to proffer a legitimate, non-discriminatory reason for discharging Ms. Williams.  See Fuentes, 32 F.3d at 763.

A defendant can satisfy its burden by presenting sufficient evidence to show that there was a nondiscriminatory reason for the plaintiff's discharge.  Fuentes, 32 F.3d at 763 (citing Hicks, 509 U.S. at 508).  The defendant need not prove that its tendered reason actually motivated its decision.  Id.  (citing Burdine, 450 U.S. at 253).  Bala has satisfied its "relatively light," burden of production here.  Fuentes, 32 F.3d at 763 (citing Burdine, 450 U.S. at 253).

Bala has submitted evidence consisting of Ms. Williams's termination form stating that the reason for her termination was that she had failed to complete certain paperwork.  (Def.'s Mot., Ex. F.)  This evidence is consistent with both the testimony of Ms. Salopek and Ms. Glazer as to why Bala decided to terminate Ms. Williams, (Glazer Dep. 16:20-24; Salopek Dep. 21:1-3), and with the explanation Bala provided to Ms. Williams for her discharge.  (Williams Dep. 87:16-21.)  Ms. Williams does not dispute that she failed to complete at least two months of paperwork.  Id.  Ms. Williams's failure to complete the patient paperwork is a legitimate, nondiscriminatory reason for her discharge.  See Healy v. New York Life Ins. Co., 860 F.2d 1209, 1214 (3d Cir. 1988) (recognizing poor performance as a legitimate business reason for termination).

## D.   EVIDENCE OF PRETEXT

Because Bala has met its burden to produce a legitimate reason for Ms. Williams's discharge, the burden returns to Ms. Williams, who may defeat summary judgment only by introducing evidence that would allow a reasonable factfinder to either disbelieve Bala's proffered reason for her termination, or to believe that an invidious discriminatory reason is the more likely source of her adversity.  Fuentes, 32 F.3d at 764.

The evidence that Bala treated a similarly situated Caucasian employee more favorably than Ms. Williams may in some circumstances be sufficient to prove that a discriminatory reason

11

was more likely than not the reason for Bala's action.  See Fuentes, 32 F.3d at 765.  Ms. Williams is not obliged to submit additional evidence of Bala's discriminatory animus in order to establish pretext.  However, based upon the record presented to the Court in connection with the pending Motion, the Court concludes that Ms. Williams has not produced sufficient evidence to enable a reasonable factfinder to resolve that Bala's proffered reason for her termination was pretext.

Bala has submitted evidence that the overwhelming majority of its workforce is comprised of African-American employees, and that there are very few Caucasian employees on staff. (Glazer Dep. 11:21; Williams Dep. at 33:7-13.)  Moreover, there is also evidence of record that Ms. Bass was not the only employee permitted to work extra hours to complete her paperwork:  in fact, the record shows that Bala also provided just such an opportunity to other African-American nurses.  (Williams Dep. 39-9:14.)

Whether or not Bala is "wise, shrewd, prudent, or competent" in its time and workforce management and delegation is not the factual dispute at issue.  Fuentes, 32 F.3d at 765.  See also Keller, 130 F.3d at 1109 (finding that "[t]he question is not whether the employer made the best or even a sound business decision; it is whether the real reason is discrimination"); Logue v. Int'l Rehabilitation Assoc., Inc., 837 F.2d 150, 155 n. 5 (3d Cir. 1988) ("[O]ur task is not to assess the overall fairness of . . . [the] employer's actions.").  A plaintiff cannot avoid summary judgment "simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations."  Fuentes, 32 F.3d 764.  Absent any evidence other than the exceedingly weak inference of discrimination raised by comparison to Ms. Bass, no reasonable factfinder could find that a discriminatory motive, rather than Ms. Williams's failure to do her required work –  which bore serious fiscal and regulatory implications for the organization –  compelled Bala's decision

to terminate Ms. Williams.  (Glazer Dep. 17:7-24; 18:1-19:1.)

**IV.      CONCLUSION**

For the reasons set forth herein, Ms. Williams has not established that Bala's proffered

rationale for her termination from employment was pretext for a discriminatory motive, and the

Court will grant summary judgment in favor of Bala on all claims.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PAULA TYRE WILLIAMS,** | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **BALA RETIREMENT AND** | : | |
| **NURSING CENTER,** | : | |
| **Defendant.** | : | **NO. 06-1005** |

**ORDER**

        **AND NOW**, this 31st day of August 2007, upon consideration of the Motion for Summary

Judgment filed by the Bala Retirement and Nursing Center (Docket No. 7), Ms. Williams's

Response and Supplemental Memorandum (Docket Nos. 8, 17), the Reply briefs filed by Bala

(Docket Nos. 11, 19), and the Motion for Partial Summary Judgment as to Punitive Damages

(Docket No. 14), and the Response thereto (Docket No. 15), **IT IS HEREBY ORDERED**:

        (1) The Motion for Summary Judgment (Docket No. 7) is **GRANTED**; and

        (2) The Motion for Partial Summary Judgment (Docket No. 14) is **MOOT**.


        The Clerk of the Court shall mark this case **CLOSED** for statistical and all other purposes.



                                                BY THE COURT:


                                                S/Gene E.K. Pratter
                                                GENE E.K. PRATTER
                                                UNITED STATES DISTRICT JUDGE